IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-2600-STV

CHRISTOPHER GREEN,

        Plaintiff,

vs.

RICK RAEMISCH, STEVE HAGER, PAUL HOLLENBECK, JOHN CHAPDELAINE, and TRAVIS TRANI,

        Defendants.
_____

VIDEOCONFERENCE DEPOSITION OF CHRISTOPHER GREEN
_____

PURSUANT TO NOTICE, the above-entitled videoconference deposition was taken on behalf of the Defendants at the office of Calderwood-Mackelprang, 9745 E. Hampden Avenue, Suite 220, on Wednesday, July 29, 2020, at 10:58 a.m., before Jana Mackelprang, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public.  Mr. Tondre and the Deponent were present via videoconference (Zoom).



EXHIBIT D

Deposition of Christopher Green

## Page 2

1  APPEARANCES:
2  For the Plaintiff:
       BRICE TONDRE, ESQ.
3      215 South Wadsworth Boulevard, Suite 500
       Lakewood, Colorado 80226
4      bricetondrepc@msn.com
5  For the Defendants:
       GREGORY R. BUENO
6      Assistant Attorney General
       Colorado Department of Law
7      Civil Litigation and Employment Law Section
       1300 Broadway, 10th Floor
8      Denver, Colorado 80203
       720.508.6644
9      gregory.bueno@coag.gov
10
11 Also Present:
       Case Manager Smythe
12
13
14
15
16
17           EXAMINATION INDEX
18 By Mr. Bueno            Pages 4, 88
19 By Mr. Tondre           Page 78
20
21
22
23
24
25

## Page 3

1           EXHIBIT INDEX
   FOR IDENTIFICATION              INITIAL
2                                  REFERENCE
3  Exhibit A - Plaintiff's Original Complaint and    21
    Jury Demand
4
   Exhibit B - DOCNet - Offender Portal - 1 page     45
5
   Exhibit C - Query Movements for Green             52
6
   Exhibit D - Disposition of Charges for Green      59
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1              P R O C E E D I N G S
2       WHEREUPON, the following proceedings were
3  taken pursuant to the Federal Rules of Civil
4  Procedure.
5              *   *   *   *   *
6       (Exhibits A through D were marked for
7  identification.)
8       THE COURT REPORTER: Will counsel please
9  stipulate that the court reporter is authorized to
10 administer the oath remotely and that no objection to
11 admissibility of the deposition will be made based on
12 validity of the oath?
13      MR. BUENO: No objection from the
14 defendants.
15      MR. TONDRE: So stipulated.
16      CHRISTOPHER GREEN,
17 having been first duly sworn to state the whole
18 truth, testified as follows:
19              EXAMINATION
20 BY MR. BUENO:
21   Q.   Okay. Good morning, Mr. Green. Are you
22 able to hear me all right? Are you able to hear me?
23   A.   Yes, sir, I can hear you.
24   Q.   I just wanted to make sure. My name is
25 Greg Bueno, and I'm an assistant attorney general. I'm

## Page 5

1  employed by the Colorado Attorney General, and I
2  represent Defendants Rick Raemisch, Steve Hager, John
3  Chapdelaine, and Travis Trani. And we're here today to
4  take your deposition in connection with the lawsuit you
5  filed against these individuals.
6       I am currently at the court reporter's
7  office building. Your attorney, Mr. Tondre, is
8  attending remotely. And you are at Buena Vista
9  Correctional Facility right now; is that correct?
10   A.   Yes, sir, I am.
11   Q.   Are you at the minimum center or at the
12 actual correctional facility?
13   A.   No, sir, after the assault occurred, I
14 ended up in protective custody, and I'm in a 6P, Unit
15 6P.
16   Q.   Okay. And is that located in the main
17 correctional facility or in the minimum center?
18   A.   No, sir, it's in the main correctional
19 facility.
20   Q.   Thank you. And could you please state
21 your full name and DOC number for the record?
22   A.   Yes, sir. It's Christopher Green, DOC
23 No. 129064.
24   Q.   Thank you, Mr. Green. Have you ever had
25 your deposition taken before?

2 (Pages 2 to 5)

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    2acc10fa-de45-4ddf-934c-f6ab350b62c8

Deposition of Christopher Green

**Page 38**

Magelssen, said to you that you were having a falling-out with your gang. Is that your testimony?

A. Yes, sir. Not just that; there was more to it. There was actually more to -- there's a back story to that, if you'd like to know that.

Q. So you're mentioning a membership in a gang. Is that a topic that you would want to talk about on the record?

A. Oh, well, I just believe in being forthcoming and honest, yes, although like talking about it sometimes messes with my mental health a little bit; it brings back memories that I don't like. I get high anxiety over thinking about it. Sometimes I get paranoid and stuff.

With that being said, there's a little more back story to it, also. One of the issues that I'd brought up to Magelssen when he brought it to my attention -- he asked me why the gang wanted to kill me. And I explained to him for two reasons.

One of the reasons was that I wanted to change my life and get out of my gang and become a productive father and father my kids as much as I can.

The other reason was that I had come out in somebody's paperwork that they considered me a snitch. But the thing is, I never told on anybody.

**Page 39**

What happened was, at the time, I had the -- I basically had the say-so, the keys for the gang.

FEMALE RECORDING: The conference is about to end.

MR. BUENO: Hold on for a second. We just got a notification that the conference is about to end. I think what we need to do is set up another one of these because I'm only about halfway done right now. So I guess that that's just one of the features of Zoom when it isn't the enterprise version.

Here's what we're going to do: I'm going to reach out to the Department of Corrections headquarters and see if they can set up a second half of this so we can finish this deposition.

THE DEPONENT: Okay. Are we going to do that today?

MR. BUENO: Yeah, we're going to do that today. I have another hour or so.

THE DEPONENT: Okay. Sounds great to me, sir.

MR. BUENO: We'll be signing off now. And, Brice, I'll send you the link as soon as I get it.

THE DEPONENT: Can I have a word with my attorney real quick?

MR. BUENO: If you want me to sign off,

**Page 40**

that's up to you guys.

THE DEPONENT: Thanks, Man, I appreciate it.

(A recess was taken from 11:56 a.m. to 12:40 p.m.)

THE DEPONENT: So where were we at? I was telling you guys basically the story --

Q. (By Mr. Bueno) Yeah, we were talking about --

A. -- the back part of what I told the intel officer?

Q. That's correct, you were telling us about the nature of what led up to the discussion with Intel and the Inspector General as far as the reason that they concluded that your life would be in danger if you were transferred to Colorado State Penitentiary.

So go ahead, continue answering that question because that's where we got cut off.

A. So, basically, where I was at was, what had occurred was the -- I ended up coming out with some guy's paperwork -- well, not his paperwork, but there was a guy that got caught with a knife in some correctional facility, and I was questioned by Intel because I was, at the time, the shotcaller for my ex-gang.

**Page 41**

And what I had stated to Dent -- Dent had asked us if we were going to go to war with the Bloods, which was another gang. And I had told them, No, that we were not going to go to war and that -- that the guy that got caught with the knife, that his own homeboys didn't even mess with him anymore.

So, basically, by me saying that one statement, the bottom line is the gang has a code to where you can't talk to Intel, period. Whether you're snitching or not, you're not supposed to talk to the Intel or cops or anything, make statements.

So that's where I had messed up with my ex-gang, was the fact that this guy had ended up -- he got caught with a knife and called a street case. And when he called the street case, he subpoenaed his DOC file.

So I had nothing to do with the guy getting caught with a knife, but the fact that I even spoke to Intel and made that statement that we weren't going to go to war with the Bloods was enough for the gang to want to cross me out, because at the time I was, I guess, politicking, and trying to fight for a higher rank in the gang. And that's when that came out and became an issue. And they said that the bottom line is that you shouldn't be talking to the Intel or

11 (Pages 38 to 41)

Calderwood-Mackelprang, Inc.   303.477.3500

**42**

1  cops regardless of whether you're telling on somebody
2  or not; you just decline the interview.
3       So that's what I had explained to Intel,
4  Mr. Magelssen, about why they wanted to kill me,
5  because a person that was in such high ranking as
6  myself in the gang at the time, that was a big, big
7  no-no, that you should know better, to never, ever talk
8  with any officers.
9       So during that time period, I had went
10 back and forth and talked to my family and stuff like
11 that and told them: You know, I'm thinking that I'm
12 just going to get out of my gang and change my life and
13 be a good father and go home to you guys and raise my
14 kids. And that was the decision that I had made and I
15 had made up my mind, and it caused a lot of conflict
16 within the gang that I used to be involved in. And I
17 had a lot of people that were there for me, still
18 supporting me, and some people that wanted to kill me.
19       And that's how all of it came about. And
20 that's what I explained to the Intel. And that's when
21 he had requested that he thinks that I need to be
22 placed out of state, an out-of-state placement, and
23 have a PC hearing.
24       When you request a PC hearing, Intel and
25 the Attorney General -- and the way the process works

**43**

1  for protective custody is they're supposed to afford
2  the offender a hearing. Well, they didn't even afford
3  me a hearing. They didn't even give me a hearing.
4  They just said, No, we're sending him to MCU anyway,
5  and he can deal with these issues when he gets there.
6       Q.   Do you have any documentation showing
7  that you requested a protective custody hearing and the
8  hearing was denied?
9       A.   I'm sure that will be in my intel file.
10 And the testimony from Mr. Magelssen and Mr. Smithgall
11 will coincide with the testimony that I'm giving you
12 today. Also, they're honest people. But if not,
13 either way, it should be documented in my intel file.
14      Like I said, they were the ones that
15 brought it up to me, and they told me -- I didn't even
16 know DOC had protective custody at the time. And they
17 said, Well, if we can't get you out of state, in the
18 worst-case scenario, let's try to get you into
19 protective custody.
20      So by policy, after reviewing the
21 piece -- the policy on protective custody, they're
22 supposed to give you a hearing to state the reasons on
23 the record for what the conditions are and why you feel
24 you need to be placed in protective custody. But DOC
25 didn't even offer me that opportunity. They wrote me a

**44**

1  letter back -- I got a letter back -- I'm not sure of
2  the name from headquarters. It said that I could
3  address my custody issues when I get to CSP. And
4  that's how that all transpired.
5       I ended up getting assaulted really bad
6  over there and having to kind of go through the wringer
7  while I was there. And then finally after I got
8  assaulted, it took that for me to finally get a hearing
9  and get sent into protective custody, which I sit here
10 now.
11      Q.   Mr. Green, you mentioned that you had a
12 conversation with Smithgall and Magelssen. Do you
13 remember how many conversations you had with these
14 individuals?
15      A.   Absolutely. I remember -- I'll never
16 forget these conversations.
17      Q.   Was there more than one?
18      A.   Oh, absolutely, sir. They were pulling
19 me out one time twice a week, sometimes three times a
20 week. They also wanted me to -- and to be honest,
21 another reason why I think -- and this is just what I
22 believe -- is I think another reason why -- they wanted
23 me to discuss some stuff that happened with a murder.
24 The Attorney General wanted to get my statement on a
25 murder that happened at Sterling Correctional Facility.

**45**

1  And so they were pulling me out frequently. They were
2  wanting me -- I feel like they were trying to play me
3  by sucking information out of me and promising me that
4  they could get me an out-of-state placement and
5  protective custody, but that didn't happen.
6       Q.   Okay. So I'm going to show you what has
7  been marked as Exhibit B. If you can't see it clearly,
8  I'm just going to explain what it is.
9       A.   Okay.
10      Q.   So this is an entry from your chron log,
11 and the one that I'm going to be asking you about is
12 the one on the very bottom of the page. This was
13 produced in discovery. It's Bates stamped CDOC/Green
14 No. 174.
15      You probably won't be able to read it
16 clearly, but I will read it verbatim and then we'll
17 take it from there. Again, your attorney will get a
18 copy of the deposition; it will include the transcript
19 and the exhibits.
20      A.   Yeah, I'd like to get a copy of that too.
21 I appreciate that, because I've never seen that before.
22      Q.   Okay. So this is a chronological log
23 entry that was entered on July 15th, 2016, by Randy
24 Smithgall. I'm going to read the entire thing and then
25 ask you some questions about it.

**Page 54**

1  attorney drafted in front of you? Do you have that
2  document with you?
3      A.  Yes, sir. I just wanted to clarify one
4  thing with you real quick about your last question. I
5  was looking through my timeline.
6      Q.  Okay.
7      A.  And it says 7/18 of 2016, I was
8  transferred to CSP and notified staff on the intake
9  packet that I had enemies in the facility.
10     Q.  Understood.
11     A.  Thank you.
12     Q.  I want to bring your attention to
13 paragraph 13. So there's one paragraph under the
14 heading that says "Facts," and it reads: "On
15 October 16, 2016" -- and I just want to focus on that
16 part for now; we'll get to the remainder of the
17 paragraph later. So you were transferred to CSP in
18 July of -- on July 18, 2016. We just established that,
19 correct?
20     A.  Yes, sir.
21     Q.  Okay. And then is it fair to say that
22 the incident referenced in paragraph 13 happened on
23 October 15th, 2016?
24     A.  That sounds accurate. Again, it's been
25 years, so I don't have the exact date on that, but,

**Page 55**

1  yes, it sounds -- paragraph 13 sounds accurate.
2  There's also additional injury that I think my attorney
3  was aware of and we're in the process of amending.
4      Q.  We'll get to that.
5      A.  Okay.
6      Q.  Right. So my question is about anything
7  that may have happened between July 18, 2016, and
8  October 15, 2016. So you were housed in Colorado State
9  Penitentiary throughout that time period, correct?
10     A.  Yes, sir.
11     Q.  Okay. And did anything notable happen in
12 that time frame, anything that would have been relevant
13 to this action?
14     A.  What do you mean as far as -- within the
15 time frame that I arrived to the time that the assault
16 took place?
17     Q.  That's correct.
18     A.  Well, several things happened, actually
19 transpired throughout that time. But I will say, I
20 will say that -- let's see -- I'll go back to my notes
21 real quick.
22     Q.  And when you say, "notes," are you
23 referring to this timeline that you keep talking about?
24     A.  Yes, sir.
25         During that time, I had started the

**Page 56**

1  grievance process about -- when transferring to my new
2  unit. During that time, I also had several
3  conversations with -- there's a major by the name of
4  Moore, M-O-O-R-E. I'm not sure of his first name. And
5  we had several conversations about my custody issues
6  and stuff like that.
7          Now, what led up to this -- during this
8  time that this assault occurred, some of the gang
9  members were able to communicate with our pod when we
10 were in another pod. We were in E4, and they were in
11 E3.
12         During this time, these gang members were
13 basically talking to the assailant and stated to him
14 that if he was to attack me and carry out this
15 assault -- the plan was to try to kill me, but he just
16 ended up assaulting me -- that he could come back in
17 good graces with the gang.
18         And that's what had ended up occurring,
19 is over a period of time, this guy -- the guy that
20 actually assaulted me, believe it or not, I saved his
21 life when we were in Sterling. They wanted us to stab
22 and kill the guy.
23     Q.  Let me ask some questions about the
24 individual. So going back to paragraph 13, you say
25 that "Manuel Edwards, an STG member," then it goes on

**Page 57**

1  to state other things, but I want to focus in on Manuel
2  Edwards. Who is that exactly?
3      A.  He is a gang member, a Sureno gang member
4  from the same gang that I used to be affiliated with.
5      Q.  Right. I wanted to clarify that as well.
6  I don't think I asked the question.
7          So Mr. Edwards is a Sureno, and your
8  testimony is that you used to be a Sureno, correct?
9      A.  Yes, sir.
10     Q.  Go on. Keep explaining who Mr. Edwards
11 is.
12     A.  So, I was able to sway him. I saved his
13 life. They wanted him dead in Sterling in, I think,
14 2013, but I was able to sway them to not kill him --
15 because he was known as a snitch, told on a murder
16 case -- and so he had a lot of respect for me.
17         So for a while, we were getting along
18 okay, until the other gang members were able to mislead
19 him into thinking that he could get back in good graces
20 if he was to carry out this attack on me. So that's
21 when he carried out the attack on me.
22     Q.  Okay. Now I'm going to read the
23 paragraph in full. "On October 15, 2016, Manuel
24 Edwards, an STG member, viciously attacked Mr. Green,
25 causing a serious injury to his nose and face.

15 (Pages 54 to 57)

Calderwood-Mackelprang, Inc.   303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                               2acc10fa-de45-4ddf-934c-f6ab350b62c8

Deposition of Christopher Green

**Page 62**

1 assigned cells till further notice pending
2 investigation. Both offenders appeared to participate
3 in a mutually combative fight after going to the lower
4 exercise cell on their own accord, shutting the door
5 and exchanging punches. Video saved as evidence.
6 Now, under where it says, "Describe
7 accused offender testimony" -- so this will be the
8 description of your testimony -- it says, Offender
9 testified the assault occurred due to his gang dropout.
10 I moved my hands while talking. I was arguing. We
11 went to the rec area to argue. I did not know I would
12 be attacked in there.
13 So my first question is: With regards to
14 the findings of guilt, did you ever appeal these
15 findings, or no?
16 A. Can you repeat that, sir?
17 Q. Did you ever appeal them to a court, is
18 what I'm getting at? Did you file a 106.5 about this
19 incident?
20 A. No, I don't recall that, sir.
21 Q. Okay. So it also says, going back down
22 to penalties, you received 30 days loss of privileges
23 on the fighting charge, and then you did not receive
24 any sanctions for the violating posted operational rule
25 charge. And this was finalized on December 16th, 2016.

**Page 63**

1 Also, before I move on to my next
2 question, I want to point out: Under a section in this
3 document that says, "Briefly describe how offender
4 behavior violated COPD," it says, "Offender was
5 observed and as engaging in a physical altercation with
6 another offender by exchanging strikes, punches, and/or
7 kicks without authorization."
8 So what part of this description of the
9 events of October 15, 2016, if any, do you dispute?
10 A. I dispute the entire incident of how it
11 transpired. I dispute the fact that, on their
12 understanding of the hearing, which I'm sure, in front
13 of the jury, they'll have a different opinion than the
14 hearing board at DOC had, but as far as -- there was an
15 argument that it was going to ensue prior to us going
16 inside that room.
17 Now, if you were to highly investigate
18 the video evidence, you will see that I was the one
19 that was attacked first. Manuel Edwards was the one --
20 I was the one who was behind the door. Manuel Edwards
21 was the one in front of the camera, visible to the
22 camera.
23 So he was the one who struck me first,
24 and the camera will show that. In the hearing, they're
25 trying to say the opposite thing. They're mistaken.

**Page 64**

1 And then they said, Oh, well, we can't see it good
2 enough; we can't see who is who, this and that. But
3 I'm sure after having my attorney and some investigator
4 review this, they'll see that the facts and the camera
5 does not lie. Manuel Edwards was clearly the one who
6 struck me first. In self-defense, I defended myself.
7 But, in the hearing, they're trying to --
8 and, again, this goes back to what I was telling you
9 earlier: I wasn't going to get any COPD charges until
10 my ex-attorney, Elizabeth Owens, let DOC know that we
11 were going to be filing a civil litigation suit. And
12 then all of a sudden DOC, to cover their backs, they
13 decided we need to make this looks like some kind of
14 mutual fight. As a matter of fact, we're going to make
15 it look like Green initiated the fight. And that's not
16 the case.
17 The videotape clearly showed Mr. Edwards
18 punching me first. He actually headbutted me in the
19 face first and then started swinging on me. And the
20 video evidence doesn't lie. The only person that was
21 lying was the interpretation of the hearings officer.
22 Q. I think you testified earlier that both
23 you and Mr. Edwards received a COPD violation; is that
24 accurate?
25 A. I can't speak as far as Mr. Edwards, sir.

**Page 65**

1 I can only speak for myself, but I do know that the
2 video clearly shows that I was attacked first. And,
3 again, I didn't know I was going to be attacked. We
4 were supposed to go inside and talk.
5 As a matter of fact, there was another
6 offender too on the phone at the time, and he witnessed
7 the assault. You might want to talk to him too. His
8 name was Justin Velasquez, and he was a witness to the
9 assault because he was the third person in there. So
10 it doesn't even make sense why we would go in there to
11 fight when somebody is in there talking to their family
12 on the phone. That's where people go to talk to their
13 family in a quiet, common area. So we went in there to
14 talk. There was no indication that I was going to be
15 assaulted in there, especially when another offender is
16 in there talking to his family.
17 Q. So you testified that you were speaking
18 with Manuel Edwards, but you also, I believe you said,
19 that you were involved in an argument with him
20 immediately before the altercation began. So what
21 exactly were you talking or arguing about, if you
22 remember?
23 A. Like I was telling you a little bit ago,
24 what I was trying to do was sway him into not believing
25 these other gang members and to wanting to carry out

17 (Pages 62 to 65)

Calderwood-Mackelprang, Inc. 303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774) 2acc10fa-de45-4ddf-934c-f6ab350b62c8

**Page 66**

1 the assault on myself, because he told me that
2 basically that's what was going on, is that they wanted
3 him to assault me, but that he wasn't going to do it.
4     So I was talking to him, telling him:
5 Hey, man, I saved your life when we were in Sterling,
6 Bro. They wanted you killed, and I stopped that. And
7 now you want to follow these guys and listen to them
8 and let them persuade you into carrying out this
9 assault on me. So that's what the conversation was
10 about.
11     Q.  Was it Mr. Edwards who told you that the
12 gang wanted him to attack you, or how did you find out
13 that it was Mr. Edwards who was going to carry out the
14 attack and then you were trying to talk him out of it?
15     A.  Again, this was over a period of time,
16 from the time that I pulled up over there in that pod.
17 During that time, I heard several conversations about
18 them telling him to take me out, this and that. And
19 for a while, I was telling him, Don't fall into that
20 stuff, don't listen to it. So I had already known, and
21 stuff like that, I'd already known a lot of this.
22     But I didn't know that he was actually
23 going to assault me, no. I know that it was being
24 talked about and discussed. Some of these
25 conversations, again, I've had with Major Moore at the

**Page 67**

1 CSP facility and told him that my life was possibly in
2 danger and what was going on, and they didn't do
3 anything about it.
4     Q.  All right. I have some questions about
5 some of the injuries and damages that you allege that
6 you suffered as a result of altercation with Inmate
7 Edwards.
8     So what injuries are you alleging you
9 suffered specifically?
10     A.  Well, not only the issue to my nasal
11 cavity, which I'm possibly going to have to get surgery
12 on that, I lost my complete sense of smell in my right
13 nostril. The doctor put me on some medication to clear
14 some of the congestion up in there. So we're working
15 on stuff like that with my nose. I lost my sense of
16 smell and I can't breathe through it.
17     Q.  I have one question before you go on.
18 Have you gotten into any physical altercations after
19 October 15th, 2016, where you suffered any sort of
20 injury to your face?
21     A.  Absolutely not, sir.
22     Q.  How about before October 15, 2016, did
23 you ever suffer any sort of injury, whether through an
24 assault or any other means, to your face?
25     A.  Absolutely not, sir.

**Page 68**

1     Q.  Okay. So I think you were talking about
2 potential treatment, and you said you lost your sense
3 of smell. Go on, tell me more about that.
4     A.  Okay. Well, just that I can't breathe --
5 it's really difficult for me to breathe through my
6 nose. It's literally closed, my nasal cavity is flat
7 shut. So even now, they're trying to get me tested for
8 this coronavirus. I can't take the coronavirus test
9 because the swab won't go through my nostril. It hurts
10 and it bleeds --
11     Q.  With regards to your nose, what are the
12 names of any physicians or other medical professionals
13 whom you are consulting with or treating with for that
14 problem?
15     A.  For the nose right now, it's Charlie
16 Kudlauskas.
17     MR. BUENO: I have the spelling for that.
18     THE DEPONENT: He's my primary provider.
19     As far as the arm is concerned, I'm
20 getting ready to see -- I'm getting ready to go to
21 Incline Orthopaedics, which is an outside bone doctor,
22 to determine on what they're going to do as far as
23 possible surgery on my torn medial collateral ligament.
24     Q.  (By Mr. Bueno) Is that the right or the
25 left arm?

**Page 69**

1     A.  That's my left arm, sir. And that was
2 the other injury that was sustained when I was blocking
3 one of his kicks. So when it -- it has already been
4 confirmed that the medial collateral ligament is torn.
5 So that's why we're just going to see if I need surgery
6 or what they're going to do now. And that's with
7 Incline Orthopaedics. I think it's in Pueblo,
8 Colorado.
9     Q.  All right. Let's go back to the
10 immediate treatment you received after the altercation
11 with Mr. Edwards, because I think you mentioned that
12 you were being photographed and whatnot.
13     So what exactly happened after the
14 altercation with regards to any medical treatment you
15 received?
16     A.  Absolutely nothing, pretty much. That's
17 going to be -- I'm sure this will be an additional
18 claim as we proceed, is the lack of common medical care
19 by the Department of Corrections. It's been now going
20 on almost five years, four years, since I've had any
21 treatment done, the necessary treatment.
22     Q.  Well --
23     A.  I've been walking around with a torn
24 medial collateral ligament for almost four years now.
25     Q.  After the altercation, did you go to the

18 (Pages 66 to 69)

Electronically signed by Jana Mackelprang (001-409-517-3774)    2acc10fa-de45-4ddf-934c-f6ab350b62c8